**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.:   CR17-00196** |
| | ) | |
| **CHRISTOPHER SHANE DREILING,** | ) | |
| | ) | |
|    **Defendant.** | ) | |

**CHRISTOPHER SHANE DREILING'S TRIAL BRIEF**

Comes now Christopher Shane Dreiling, by and through his trial counsel, Latisha V. Colvin, and files this Trial Brief with this Honorable Court for its convenience before the November 27, 2018, trial of this case.  As grounds in support thereof, Dreiling shows the following:

**I.    Introduction**

There exists little dispute between the parties with regard to the facts of this case.  Rather, what ultimately is at issue is whether the facts, along with expert evaluation of the case and of Dreiling, legally support or excuse Dreiling's conviction of the charged offenses.

**II.    Facts and Expert Evidence**

**A.    Facts**

On the evening of August 20, 2017, just after sunset, Christopher Shane Dreiling contacted United States Coast Guard Sector Mobile from the commercial fishing vessel, "Billy B", via VHF radio.  Dreiling was a crew member on the "Billy B", along with another crew member, Anthony Jason "A.J." Love, and Noah Paul Gibson, the vessel's captain.  Dreiling and

Love had known each other for around five years, but Dreiling and Gibson did not know each other. The vessel, a shrimp boat, had launched from Bon Secour, Alabama, a few days prior and was underway fishing in the eastern Gulf of Mexico, approximately 45 nautical miles offshore and southeast of Orange Beach, Alabama.

Dreiling made the distress call to the Coast Guard claiming that the two other men on the boat had been hired to kill him for a sum of $100,000. Just before the call, he had stabbed the two men to prevent them, as he thought, from killing him first. Dreiling stabbed Gibson first, on his face and in his back, before Gibson jumped overboard. He had gone after Gibson first because he thought that he had seen a gun on him, and he wanted to prevent Gibson from killing him, as Dreiling thought that he had been hired to do. Dreiling fought for a bit with Love, chasing him around the boat, then stabbed him multiple times and pushed him overboard as well. Dreiling thought that Love had acted strangely towards him, right before Love and Gibson had planned to kill him at sundown.

Dreiling just wanted to get them off of the boat so that the threat that he saw them as would be eliminated. He saw them laughing at times, and swore that they were talking about what each man would do with his share of the $100,000, which was the bounty on his head. Convinced that he would die, but betrayed by his brain, Dreiling did what he thought he had to do to save his life.

In addition to calling for help once Love and Gibson were in the water, Dreiling threw them a life raft. The Coast Guard Cutter "Kingfisher" was on its way from Panama City, Florida, to New Orleans, Louisiana, for maintenance when Dreiling's distress call came through over the radio. Shortly after hearing this radio transmission, Sector Mobile contacted the crew onboard

the "Kingfisher" to redirect the cutter approximately 7.5 nautical miles away from its location, to where the "Billy B" was situated. The "Kingfisher" responded in the direction of two red flares, the first approximately 6 nautical miles away, and the second approximately 4.5 nautical miles away. As the "Kingfisher" approached the "Billy B", one of the Coast Guard officers saw a life raft about 200 to 300 yards off the stern of the shrimp boat. Gibson and Love were in the water, clinging to the life raft that Dreiling had thrown to them.

Gibson and Love were rescued from the life raft onto the deck of the "Kingfisher" for medical treatment of their stab wounds. Gibson had a large, deep cut on his face and another stab wound in the middle of his back. He was also nude. Love had multiple stab wounds over his body, including on his back, abdomen, arms, neck, chest, hand and face. He was in worse condition than was Gibson, and he could not walk.

Gibson told the Coast Guard officers that Dreiling "went crazy thinking that he and Love had orders to kill him." He said that Dreiling stabbed him in the back and ear, then he "jumped overboard. . . and that's when Chris started chasing A.J. around the boat." Gibson stated that Love tried getting the knife away from Dreiling but they ended up in a scuffle and Dreiling threw Love overboard. Gibson also said that he "didn't really know" Dreiling, but he had worked with Love several times and knew him well. Gibson hired Dreiling because Love had recommended him. Gibson described Dreiling as quiet and fairly unemotional, as well as hardworking and a good listener.

About an hour later, a medical helicopter arrived and hoisted Gibson and Love from the cutter to take them to Pensacola Baptist Hospital. After the Medivac was complete, the "Kingfisher" remained on scene with the "Billy B" shrimp boat to await a Coast Guard

investigations boarding team that was enroute from Pensacola, Florida.

The cutter pulled alongside the "Billy B", and officers told Dreiling that another vessel was coming out to assist. Dreiling was pacing around constantly and going on top of the cabin. He advised that he had a cut on his knee and arm but had not tended to his injuries because he was afraid of Gibson and Love coming back on board the "Billy B".

Once onboard the "Billy B", officers handcuffed Dreiling. He was frisked for safety, and no weapons were found on him. He was compliant with the officers and their instructions. Gibson had told the officers that he himself had a .243 bolt action rifle and a .22 caliber pistol onboard the "Billy B". The officers found the pistol in an open duffle bag located on the top rack in the cabin. It was loaded with one round in the chamber and six more rounds in the magazine. They could not find the rifle at first. Dreiling told them that he had thrown it overboard, then he told them that he had not thrown it overboard; rather, it was on top of the pilot house. Upon further inspection of the vessel, one of the officers located the rifle and a bloody knife on top of the pilot house. They also found a box containing nineteen unspent .243 rifle rounds and an empty soft gun case on the main deck. Dreiling thought that he had seen a pistol on Gibson's person, but he told the officers that he was unaware of the pistol on board the vessel.

The "Billy B" was towed back to shore. The Coast Guard investigation revealed that prior to the incident, all crew members aboard the "Billy B" – Dreiling, Gibson and Love – were fishing in their assigned duty positions. No previous arguments or altercations were reported between the crew prior to the incident.

Coast Guard Investigative Services Agent Juan Joy was assigned the case. He interviewed Gibson and attempted to interview Love, but could not immediately because he was

in surgery.  Gibson told Agent Joy that he and Love were catching grouper when Dreiling began "stabbing me out of the blue" with a knife.  He jumped overboard and swam to the outrigger and held onto a chain.  He then saw Dreiling chasing and attacking Love with a knife, so he told Love to pick up something and hit Dreiling with it in order to get the knife away from him.  After fighting with Dreiling, Love jumped overboard and into the water.  Gibson told Agent Joy that when he (Gibson) and Love were in the water, he heard Dreiling say that he "heard y'all talking about killing me at dark."  Gibson also said that Dreiling mentioned "$100,000" repeatedly, but Gibson was confused about what Dreiling was saying.  Gibson asked Dreiling to throw them a life raft so that he and Love could float away, and Dreiling did.   After getting instructions from Gibson on how to operate the radio, Dreiling also made a mayday call over the radio so that Gibson and Love could get help.

Following his surgery, Agent Joy was able to interview Love.  Love told Agent Joy that he knew Dreiling from working on another fishing boat, which was owned and operated by a man named Charlie Graham.  Dreiling had contacted him about needing work, so Love helped him by requesting that Gibson hire him for the upcoming trip on the "Billy B".

Love told Agent Joy that the men had fished for two to three full days before the incident. He said that there had been no previous fights or disagreements, or any indication of any malice or ill feelings among the crew.  Love described the day of the incident as occurring right after sunset, just as it was beginning to get dark.  He described the incident as completely unprovoked. After he and Gibson were stabbed and in the water, Love said that Dreiling warned them both not to come back on the boat.  He said that Dreiling made Gibson remove his clothes in order to make sure that he did not have a gun on him.  He said that Dreiling started talking about Charlie

and money, and that Gibson and Love were going to kill him.  Love stated that he had no idea what Dreiling was talking about.

Love stated additionally that Gibson had a .22 caliber pistol onboard, and that they had shot it once during the trip.  He stated further that he never saw Dreiling drink or do drugs during their voyage.

Agent Joy interviewed Dreiling at the Alabama Law Enforcement Agency (ALEA) Department of Public Safety, Marine Patrol Division facility in Orange Beach, Alabama. Dreiling told Agent Joy that he earlier had made a derogatory comment about another vessel captain, Charlie Graham, stating that "somebody needs to kill that motherfucker".  He believed that his comment had gotten back to Charlie Graham, who in turn hired Gibson and Love to kill him when it got dark, then throw his body overboard.  He also believed that Love and Gibson were angry with him for making this comment.  Dreiling said he believed that Gibson and Love were to be paid $100,000 for his murder.  Dreiling said to Agent Joy that he prayed to God for forgiveness before he stabbed the men because he did not want to do it.  Gripped by paranoia, Dreiling stood firm in the delusional belief that if he did not proactively act, he would be murdered.  Convinced that he would die, but betrayed by his brain, Dreiling did what he thought he had to do to save his life.

Dreiling explained to Agent Joy that he saw a gun in Gibson's waistband, and that was why he stabbed him first.  He said that he wanted to "disable" Gibson and Love and get them off the boat.  Dreiling denied doing any illegal drugs or drinking any alcohol while on the "Billy B". He told Agent Joy that a week or two earlier, he had smoked a little marijuana, and a day or two before boarding the "Billy B", he had taken a pain pill.

Dreiling was taken to South Baldwin Regional Medical Center for treatment of his injuries. He told hospital staff that he committed the stabbings to prevent the other crew members from harming him first. He also submitted to a drug toxicology test. The test results revealed a low positive value for THC (marijuana) and a negative value for all other drugs.

On August 31, 2017, Dreiling was named in a two-count indictment in the Southern District of Alabama, alleging two counts of assault with intent to commit murder within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. §§ 7(1) and 113(a)(1). Doc. No. 13.

### B.  Expert Evidence

### Dr. Robert D. Shaffer  (*For Dreiling*)

At the request of the defense, Dreiling was evaluated by forensic psychologist Dr. Robert D. Shaffer, Ph.D. Dr. Shaffer opined that Dreiling "demonstrated paranoid delusional psychosis at the time he stabbed two crew members and forced them off of the fishing boat. His delusions were also quite similar to a well-documented psychotic episode in 2012 where he exhibited behaviors that were obviously insane to police and medical personnel at the time, but which appeared perfectly reasonable to Mr. Dreiling, who was terrified that he would be shot and killed by acquaintances and strangers. While on the boat Mr. Dreiling became convinced that his life was threatened." *See attached* Sealed Dr. Shaffer Report at p. 10.

Dr. Shaffer also noted that, as to Dreiling, "[n]eurocognitive testing reveals mild frontal lobe executive function deficits. This finding is consistent with [an] MRI image of irregularity in the left frontal lobe of Mr. Dreiling's brain." *Id*. at p. 6. After examining images of Dreiling's physical brain, he concluded that Dreiling's "history of meningitis, seizures, and accidental

sources of head trauma predispose him to abnormal brain functioning. This is confirmed in the 2013 MRI scan with obvious frontal lobe abnormalities in white matter. Individuals with psychosis typically demonstrate loss of brain matter in the front and temporal lobes." *Id*. at p. 9. Dr. Shaffer performed several neuropsychological tests on Dreiling, which yielded results in the "impaired range." *Id.* at pps. 7-8.

Dr. Shaffer stated that Dreiling indicated that he thought that Love "might have told a fishing boat owner that Mr. Dreiling had made a hostile comment to A.J. [Love] about the boat owner. . . . Once on the boat Mr. Dreiling gradually developed an elaborate delusion that the boat owner may have heard about this comment and then offered $100,000 to the crew if they killed Mr. Dreiling and dumped his body overboard. Mr. Dreiling could not offer any explanation why the boat owner would go to this length to kill him. They never had business together or any incidents that might cause animosity. These thoughts of a plot to kill him crystallized for Mr. Dreiling while he was on the boat with the other two men. . . . He misinterpreted random behavior and believes he overheard specific comments about killing him and throwing him overboard. When they were quiet he thought their behavior was strange and became convinced that they were somberly anticipating his murder. When they appeared happy he thought it was odd, so he assumed they were talking about the large sum of money they would receive for his death. Mr. Dreiling's description of his thoughts displayed typical paranoid delusion. It also was very similar to the incident in 2012 in California, except this time he had no means to run away once he was on the boat." *Id*. at pps. 8-9.

Dr. Shaffer stated further that "Mr. Dreiling has a long history of neurological and emotional symptoms." *See* Dr. Shaffer Report at p. 9. He ultimately concluded that "[o]n the

boat Mr. Dreiling acted in a manner that would be reasonable and rightful were his delusion actually true.  The urge to protect oneself from death is known to be one of the strongest human motivations.  In law and moral codes, violent self-defense against the threat of unlawful attack is considered to be appropriate.  Mr. Dreiling's will to live compelled him to act forcefully and violently."  *Id*. at p. 11.

### Dr. Judith "Betsy" Campbell  (*For the government*)

At the government's request, Dreiling subsequently was evaluated by Dr. Campbell with the federal Bureau of Prisons ("BOP").  In her report, she stated: "Dr. Shaffer reported he believed Mr. Dreiling was suffering from paranoid psychosis which led to a delusional belief system regarding his crew mates whom he assaulted.  ***There is a possibility that Dr. Shaffer is correct***."  *See attached* Dr. Campbell Sealed Report at p. 5 (emphasis added).  Dr. Campbell opined that "[a]t the time of the alleged offense behavior, a series of actual events as well as perceived statements and behaviors led Mr. Dreiling to believe, in his paranoid world view, that, he did not have any other viable options and needed to defend himself against an imminent threat – i.e. his crewmates' plot to harm or kill him.  ***As noted by Dr. Shaffer, if Mr. Dreiling's beliefs [that] he was going to be harmed were accurate, his behavior would be considered reasonable and justified***."  *Id*. at p.6.  (emphasis supplied).

She wrote that although law enforcement officials had told her that they believed that Dreiling "knew what he was doing", they also let her know that "they believed Mr. Dreiling has some mental issues, because he could not provide them with specific statements or actions which confirmed his beliefs he was going to be harmed."  *Id*. at p. 3.  She also described Gibson and Love's characterization of the incident as "a complete surprise."  *Id*.

Dr. Campbell noted that Dreiling said about the incident that "I was just scared – I wanted everyone to be alive and ok – I just wanted them away from me – and then once I got them away from me – I got them a raft, and I called for help – I got them the beacon so I knew they were safe – I didn't want them to die – I just wanted to be safe – I wasn't trying to kill them I just wanted them off that boat."  She also noted that "[h]e expressed concern that others who were friends of his crewmembers might have heard him on the radio and might be coming to get him.  He also reported he asked the Coast Guard officers repeatedly if the two victims were ok and indicated he wanted them to be ok."  *Id*. at p. 3.

Dr. Campbell reported that when she questioned Dreiling about the wrongfulness of his actions, he "stated he approached the Captain with a knife because he could see the Captain had a gun hidden in his shorts."  She reported further that "Mr. Dreiling then compared this incident to the previous incident he experienced in California, when he believed people he was hanging around were going to hurt him. . . . He explained he generally handled his paranoia by fleeing and running away from the perceived threat."  *Id*. at. p. 4.  She stated that "[b]ased on a review of records, Mr. Dreiling has previously experienced other episodes (three) over the course of his lifetime in which he believed others were out to get him or after him for some reason.  *Id*.

Dr. Campbell opined that "[a]ll parties involved denied there was any alcohol or drug use while on the boat, suggesting Mr. Dreiling may possibly have been experiencing the side effects of withdrawal – primarily from alcohol – which also could have been impairing his ability to think clearly."  *Id*. at p. 6.  Ultimately, Dr. Campbell diagnosed him with "a paranoid personality disorder."  *See id*. at 5.

III.  <u>**Legal Authority Governing the Affirmative Defense of Insanity**</u>

## A. The Defense of Insanity

The government first must prove each and every element of the charged offenses beyond a reasonable doubt before the defense is required to prove the affirmative defense of insanity: "Because insanity is an affirmative defense, the government first had to prove that McIntosh committed the offenses in question before he could be acquitted due to a mental disease or defect." *United States v. McIntosh*, 900 F.3d 1301, 1304 (11th Cir. 2018); *see also United States v. Dubray*, 854 F.2d 1099, 1101 (8th Cir. 1988)("Once the prosecution has proved the required mental elements of the crime, a defendant may still establish the distinct affirmative defense of legal insanity by clear and convincing evidence."); *United States v. Polizzi*, 545 F. Supp. 2d 270, 278 (E.D. NY. 2008)("Even though the defendant has raised the defense of insanity, the government still has the burden of proving all the elements of the offense beyond a reasonable doubt.").

"The Insanity Defense Reform Act was passed in the wake of John Hinckley's acquittal of charges arising from his actions in shooting President Ronald Reagan and Press Secretary James Brady." *United States v. Cameron*, 907 F.2d 1051, 1061 (11th Cir. 1990).

> The Insanity Defense Reform Act produced three principal changes to the insanity defense in federal courts. First, the definition of insanity was restricted so that a valid defense only exists where the defendant was 'unable to appreciate the nature and quality or the wrongfulness of his acts' at the time of the offense. The amendment thus eliminated the volitional prong of the defense; prior to the act, a defendant could assert a valid defense if he were unable to appreciate the nature of his act or unable to conform his conduct to the requirements of law. *United States v. Weeks*, 716 F.2d 830 (11th Cir. 1983). The second change produced by the Act resulted in a shifting of the burden of proof from the government to the defendant. Prior to the Act, the government was required to prove beyond a reasonable doubt that the defendant was sane at the time of the offense. *See Davis v. United States*, 160 U.S. 469, 16 S. Ct. 353, 40 L. Ed. 499 (1985). Under the current act, the defendant must prove his insanity by clear and convincing evidence to escape

criminal liability.  The third change prohibits experts for either the government or defendant from testifying as to the ultimate issue of the accused's sanity.  The act changes Federal Rules of Evidence 704 so as to provide:

No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto.  Such ultimate issues are matters for the trier of fact alone.

Fed.R.Evid. 704 (b).

*See United States v. Freeman*, 804 F.2d 1574, 1575 (11th Cir. 1986).

Additionally, the Act "created a special verdict of 'not guilty by reason of insanity,' which triggers federal civil commitment proceedings, 18 U.S.C. § 4242(b)." *Cameron*, 907 F.2d at 1061.

The defense of insanity statutorily is codified at 18 U.S.C. § 17, and states:

(a)  Affirmative defense.  It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts.  Mental disease or defect does not otherwise constitute a defense.
(b)  Burden of proof.  The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

The Eleventh Circuit has held that "Section 17 of Title 18, states that insanity is a 'defense to a prosecution under *any* Federal statute. . . .' 18 U.S.C. sec. 17(a) (emphasis added)." *United States v. Owens*, 854 F.2d 432, 434 (11th Cir. 1988).  The Court has also held that where a defendant puts forth sufficient evidence of his insanity at the time of the offense, the Court must allow the jury to consider the issue:

"We hold that, where the issue of insanity has otherwise been properly raised, a federal criminal defendant is due a jury instruction on insanity when the evidence would allow a

reasonable jury to find that insanity has been shown with convincing clarity. Recalling the jury's

right to determine credibility, to weigh the evidence, and to draw justifiable inferences of fact,

the trial judge must construe the evidence most favorably to the defendant. The court also needs

to remember that, although the 'clear and convincing' standard is a fairly high one, 'clear and

convincing' does not call for the highest levels of proof. If evidence would permit the jury to

find to a high probability that defendant was insane, an insanity instruction is required." *See*

*Owens*, 854 F.2d at 435-36. "As long as there is an evidentiary foundation in the record

sufficient for the jury to entertain a reasonable doubt, a defendant is entitled to an instruction on

his theory of the case." *Government of Virgin Islands v. Carmona*, 422 F.2d 95, 99 (3rd Cir.

1970).

**B.      Psychiatric Evidence to Negate Specific Intent**

In its passage of the Insanity Defense Reform Act, "Congress did not eliminate the use of

'psychiatric testimony to negate specific intent.'" *Cameron*, 907 F.2d at 1064. "Evidence

offered as 'psychiatric evidence to negate specific intent' is admissible . . . when such evidence

focuses on the defendant's specific state of mind at the time of the charged offense." *Id*. at 1067.

"The language of the Act does not on its face seem to bar the use of such evidence to negate

specific intent: 'Because admitting psychiatric evidence to negate mens [rea] does not constitute

a defense but only negates an element of the offense, § 17(a) by its terms does not bar it. Section

17(a) states only that 'mental disease . . . does not otherwise constitute a defense;' it does not

purport to establish a rule of evidence.'" *Id*. at 1065 (internal citations omitted).

**IV.    Legal Authority Governing the Admissibility of Dreiling's 2012 California Episode
         and Lay Witness Testimony in Support of Dreiling's Insanity Defense**

## A.    The Episode

As referenced by both Dr. Shaffer and Dr. Campbell, there exists a prior episode of paranoia and delusion which Dreiling experienced in California in 2012.  This episode was documented in records examined by both doctors, and it was elicited by each from Dreiling in the course of each of their respective evaluations of him.  The episode was outlined in the following detail in Dr. Shaffer's report.  *See* Dr. Shaffer's Sealed Report at pps. 3-4.

In that episode, Dreiling was living in California with a friend, and they both were staying in the home of the friend's sister.  There came a point where Dreiling developed suspicious feelings about his friend and thought that his friend was yelling negative things about him outside, which would prompt the neighbors to come to kill him.  Dreiling left in the middle of the night from the home, fearing that people all had guns and were going to kill him.  He also began to hear strange whistling noises that he thought were the people mysteriously communicating with each other, as well as taunting him.

Dreiling fled on foot and on buses in the middle of the night in an attempt to get away.  Terrified, he climbed up a tree, and he crawled atop the roof of a stranger's home in order to get away and hide.  From the roof, he became convinced that passengers passing by in cars were closing in on him.  He knocked on someone's door, who called police, and he was taken to jail overnight.

When he left jail the next day, he went to a nearby city and checked into a motel.  He thought he saw his friend in the shadows in a car in the parking lot of a store.  Inside the store, he thought he recognized another person from the city from which he had fled.  He thought that all the people thought he was dumb and were trying to surround him.  When he returned to his motel

room, he saw a man across the courtyard close his blinds. Dreiling assumed that the man thought that he (Dreiling) was dumb, or that he was ignorant of the fact that he was being watched. He thought that the people had followed him from two cities away.

Dreiling went to the hotel lobby and told the people there that he was in danger. He thought that he heard someone laughing, as well as the strange "communication" whistling that he had heard the night that he originally fled. Police and an ambulance were called, and Mr. Dreiling was taken to the hospital. He was "freaking out in the back of the ambulance", *see* Dr. Shaffer's Sealed Report at p. 4, "because he couldn't convince the ambulance driver that a certain car he saw on the road near the ambulance was following them." *Id*. at p. 4. After this episode, per records, on September 16, 2012, Dreiling "was hospitalized and treated with antipsychotic medication." *Id*.

### B.      Opinion Testimony by Lay Witnesses

Dreiling potentially will elicit testimony from a family member as Fed.R.Evid. 701 opinion testimony of his mental state in support of his defense of insanity.

"If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed.R.Evid. 701. "Rule 701 does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences." *United States v. Hill*, 643 F.3d 807, 841 (11th Cir. 2011).

In reversing the robbery convictions of Defendant Goodman, an Iraq war veteran, because the district court improperly restricted lay witness testimony regarding his mental state in support of his insanity defense, the Tenth Circuit reasoned:

> Our cases have been generous in extending broad latitude to lay testimony in insanity trials.  The leading precedent is *United States v. Austin*, 933 F.2d 833 (10th Cir. 1991), where we concluded that 'when insanity is an issue ***all evidence of mental difficulties, either before, after, or on the date of the alleged offense is admissible*.' *Id*. at 842 (emphasis added).  In *Austin*, we considered the exclusion of a defendant's eight-year-old medical reports, which the defense hoped would help show the defendant's insanity.  The district court excluded them as too old to be relevant.  We reversed, clarifying that we have never 'placed a temporal limit on relevant proof of mental illness.' *Id*.  Instead, mental health evidence can retain its relevance 'in view of its frequently long duration, its possible chronicity as suggested by the tendered exhibits and its recurrent manifestations within the common knowledge' of lay witnesses.  *Id*.; *see also Davis v. United States*, 364 F.2d 572, 574-75 (10th Cir. 1966)('The instruction . . . is . . . too restrictive in that it limits the accused's evidence as to her mental condition to the time of the commission of the crimes. . . . Such evidence may instead relate to conditions existing both before and after the crime.').
>
> While we offer no general rule concerning the point at which evidence of insanity becomes too stale to be relevant, the excluded evidence in this case did not cross the line.  Unlike the eight years of behavior at issue in *Austin*, Goodman's excluded evidence at most would have been only three years old, and part of a continuous pattern that developed from the beginning of his psychiatric treatment up to the time of the robberies.  ***The proffered evidence was based on the direct observations of close family and friends, and is the type of evidence that can bolster expert mental health testimony*.**  Based on our reading of *Austin*, the district court erred by limiting the temporal scope of Goodman's lay witnesses.

*United States v. Goodman*, 633 F.3d 963, 966-967 (10th Cir. 2011)(emphasis added).

In 2015, the Eleventh Circuit affirmed this reasoning in *United States v. Watson*, 611 Fed. Appx. 647, 660-661 (11th Cir. 2015)(". . . *see also United States v. Goodman*, 633 F.3d 963, 968 (10th Cir. 2011) ('The Federal Rules of Evidence do not . . . categorically prohibit lay witnesses from offering opinion testimony regarding the defendant's mental state.'))".

**C. Applicable Law Governing Dreiling's Constitutional Right to Present a Complete Defense**

"The Sixth Amendment to the United States Constitution guarantees defendants the right to have 'compulsory process for obtaining witnesses in his favor.' U.S. Const. amend. VI. Implicit in this right--as well as in the basic notion of 'due process of law' in general, *see* U.S. Const. amend V--is the idea that criminal defendants must be afforded the opportunity to present evidence in their favor. *See Specht v. Patterson*, 386 U.S. 605, 610, 87 S. Ct. 1209, 1212, 18 L. Ed. 2d 326 (1967) ('Due process . . . requires that [the defendant] . . . have an opportunity to be heard . . . and to offer evidence of his own.'); *United States v. Ramos*, 933 F.2d 968, 974 (11th Cir. 1991) ('A criminal defendant's right to present witnesses in his own defense during a criminal trial lies at the core of the fifth and fourteenth amendment guarantees of due process.')." *United States v. Hurn*, 368 F.3d 1359, 1362 (11th Cir. 2004).

"A district court's exclusion of a defendant's evidence violates these Compulsory Process and Due Process guarantees in four circumstances. First, a defendant must generally be permitted to introduce evidence directly pertaining to any of the actual elements of the charged offense or an affirmative defense. Second, a defendant must generally be permitted to introduce evidence pertaining to collateral matters that, through a reasonable chain of inferences, could make the existence of one or more of the elements of the charged offense or an affirmative defense more or less certain. Third, a defendant generally has the right to introduce evidence that is not itself tied to any of the elements of a crime or affirmative defense, but that could have a substantial impact on the credibility of an important government witness. Finally, a defendant must generally be permitted to introduce evidence that, while not directly or indirectly relevant to

any of the elements of the charged events, nevertheless tends to place the story presented by the prosecution in a significantly different light, such that a reasonable jury might receive it differently." *Hurn*, 368 F.3d at 1363 (footnotes omitted)(emphasis added).

In the instant case, the foregoing four criteria justify the admission of testimonial evidence regarding the 2012 California episode outlined above, as well as possible lay witness testimony concerning Dreiling's mental state.

First, the evidence is relevant and admissible because it directly is relevant to the specific intent element of the charged offense and is central to the issue of whether Dreiling possessed the requisite specific intent in the commission of the alleged crime. "The most obvious component of a defendant's Fifth and Sixth Amendment right to present evidence in his favor is to present evidence that has a direct bearing on a formal element of the charged offense. 'A defendant's right to a fair trial is violated when the evidence excluded is material in the sense of a crucial, critical, highly significant factor.' *United States v. Ramos*, 933 F.2d 968, 974 (11th Cir. 1991)". *Hurn*, 368 F.3d at 1363 (some internal citations omitted).

Additionally, the evidence directly pertains to Dreiling's affirmative defense of insanity. Dr. Shaffer opined that "[t]his incident from 2012 involved symptoms and behavior that were similar to his behavior on board the fishing boat in the present case". *See* Dr. Shaffer's Sealed Report at p. 4. As discussed above, Dreiling has the burden to prove by clear and convincing evidence that he was insane at the time of the incident, so he must be permitted to introduce evidence that is directly relevant to his mental state.

Second, as previously stated, counsel believes that the evidence directly is related to the element of specific intent to commit murder. However, as to the second criteria, even if it is

deemed to pertain only to collateral matters and not to any element of the charged offense, the proffered evidence still would be admissible under the test articulated in *Hurn*. This is because the evidence, "through a reasonable chain of inferences, could make the existence of one or more of the elements of the charged offense or an affirmative defense more or less certain." *Id.* at 1363. "A defendant also has the right to introduce evidence that is not directly relevant to an element of the offense, but that makes the existence or non-existence of some collateral matter somewhat more or less likely, where that collateral matter bears a sufficiently close relationship to an element of the offense." *Id.* at 1364.

Third, this proffered evidence would be relevant to the credibility of an important government witness, Dr. Campbell, who will testify about Dreiling's mental state.

Fourth, the evidence places the government's evidence in a different light, and it also casts doubt on the government's theory of the case. As the *Hurn* Court noted: "In some cases, the government's selective presentation of entirely truthful evidence can cast a defendant in an inaccurate, unfavorable light, or make entirely legitimate, normal, or accepted acts appear unusual or suspicious. In these situations, the defendant has the right to introduce additional evidence to dispel this unjustified taint, even if that evidence does not directly or indirectly bear on a particular element of an offense." *Id.* at 1366-67. "Technically, a defendant's motives or character are irrelevant to a jury's determinations; nevertheless, as a practical matter, they cannot help but color the jury's verdict. . . . the defendant ha[s] the right to 'complete the picture.'" *Id.* at 1367.

Specifically here, testimony regarding the 2012 California episode and any Fed.R.Evid. 701 lay witness testimony regarding his mental state comports with Dreiling's constitutional right

to combat the government's case theory, and to meet the burden of proof of his insanity defense.

A criminal defendant's fundamental, well-established right to assert a complete defense has its roots in the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. *See Holmes v. South Carolina*, 126 S. Ct. 1727, 1731 (2006); *see also Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 2146-47 (1986). The Supreme Court has explained:

> Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard. *Holmes*, 126 S. Ct. at 1731; *Crane*, 476 U.S. at 690, 106 S. Ct. at 2146.

"A defendant who has been denied an opportunity to be heard in his defense has [indeed] lost something indispensable." *See United States v. Frazier*, 387 F.3d 1244, 1301-03 (11th Cir. 2004)(Birch, J., dissenting)(internal citation omitted).

Moreover, Dreiling asserts that the proffered evidence is relevant, and otherwise conforms with the admissibility requirements of the Federal Rules of Evidence.[1] He does not seek the admission of testimony regarding the 2012 California episode or any Fed.R.Evid. 701 lay witness testimony regarding his mental state for character purposes under either Fed.R.Evid. Rule 404(a) or Rule 608(b).

In addition to being directly relevant to rebut the government's evidence regarding his specific intent as well as to support his affirmative defense of insanity, the evidence also is

---

[1] "In [*United States v.*] *Anderson*[, 872 F.2d 1508 (11th Cir.1989), the Court instructed that the right to present a defense is subject to compliance with the rules of evidence. *Id*. at 1519." *United States v. Veltmann*, 6 F.3d 1483, 1495 (11th Cir. 1993).

probative and admissible under Rule 404(b)[2] to show that he lacked the requisite specific intent to commit the charged offense. The Eleventh Circuit has recognized the admissibility of evidence which a defendant seeks to introduce for those limited purposes as "reverse 404(b)" evidence. *See United States v. Cohen*, 888 F.2d 770 (11th Cir. 1989); *United States v. McClure*, 546 F.2d 670 (5th Cir. 1977). Also, the proffered evidence should be subject to a less restrictive standard of admissibility because it is being offered by Dreiling, and because it is being offered by the defense exculpatorily, so prejudice no longer is a factor. *See Cohen, supra* at 777 ("When the defendant offers similar acts evidence of a witness to prove a fact pertinent to the defense, the normal risk of prejudice is absent."); *see also United States v. Stevens*, 935 F.2d 1380, 1402-1404, 1406 (3rd Cir. 1991)(noting first that "'reverse 404(b)' evidence is utilized to exonerate defendants", then collecting cases "in order to illuminate how 'reverse 404(b)' evidence has been used in the past.").

As the Third Circuit recognized in *Stevens*: "Our resolution of this issue is informed by our general belief that a criminal defendant should be able to advance any evidence that, first, rationally tends to disprove his guilt, and second, passes the Rule 403 balancing test. To garner an acquittal, the defendant need only plant in the jury's mind a reasonable doubt. . . . We do not know, of course, how a jury would weigh this evidence, but we do think that, at the very least, Stevens was entitled to have the jury consider the evidence and draw its own conclusions."

---

[2] Rule 404(b) provides: "Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial."

*Stevens*, 935 F.2d at 1406.

Evidence of the 2012 California episode and any Fed.R.Evid. 701 lay witness testimony regarding his mental state is probative as to the specific intent element of the charged offense, is crucial to Dreiling's theory of defense, advances his effort to meet his insanity defense burden, and it is not unduly prejudicial or confusing under Fed. R. Evid. 403(b).  As the *Cohen* Court concluded: "The trial court's discretion does not extend to exclusion of crucial relevant evidence."  *Id*. at 777.

However, even if an evidence rule dictated exclusion of the evidence, Dreiling's constitutional right to present a complete defense would prevail: "Nevertheless, the fact that a particular rule of evidence requires the exclusion of certain evidence is not dispositive, as particular applications of a generally valid rule may unconstitutionally deny a defendant his rights under the Compulsory Process or Due Process Clauses.  *See Knight v. Dugger*, 863 F.2d 705, 729 (11th Cir. 1988) (noting that a conviction must be reversed where there is 'either clear error by the trial courts in their evidentiary rulings or compelling reasons for exceptions to state evidentiary or procedural rules')."  *See Hurn*, 368 F.3d at 1363, at note 2.  And as similarly reasoned by the Eleventh Circuit in *Cohen*: "By preventing the introduction of relevant evidence of the prior conduct of an essential government witness, the court deprived the Cohens from presenting an adequate defense and thus deprived them of a fair trial.  We have no alternative but to require a new trial."  *Cohen*, 888 F.2d at 777.

## V.    <u>Conclusion</u>

Undersigned counsel for Christopher Shane Dreiling hereby files this Trial Brief for the

convenience of the Court.

Respectfully Submitted,

s/ Latisha V. Colvin
Latisha V. Colvin (COLVL9139)
Federal Defenders Organization, Inc.
11 North Water Street, Suite 11290
Mobile, AL 36602
(251) 433-0910 (telephone)
(251) 433-0686 (facsimile)

Attorney for Christopher Shane Dreiling

## **CERTIFICATE OF SERVICE**

I hereby certify that I have on this the 21st day of November 2018, served a copy of the

foregoing pleading by filing same with the Clerk of Court using the CM/ECF system which will

notify:

Michael Anderson, Assistant United States Attorney

Alex Lankford, IV, Assistant United States Attorney